JHK:DMB/JPL/BWB
F.#2010R00057

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA          Cr. No. <u>10-019 (S-3)(RJD)</u>

   - against -

ABID NASEER, et al.,

       Defendants.

- - - - - - - - - - - - - - X

## <u>AFFIDAVIT IN SUPPORT OF REQUEST FOR EXTRADITION OF ABID NASEER</u>

I, Jeffrey H. Knox, being duly sworn, state that:

1.   I am a citizen of the United States of America and a resident of the State of New York.

2.   I graduated from Northwestern University School of Law in 1999. From November 2003 to the present, I have been employed by the United States Department of Justice as an Assistant United States Attorney for the Eastern District of New York. My duties are to prosecute persons charged with criminal violations of the laws of the United States. During my practice as an Assistant United States Attorney, I have become knowledgeable about the criminal laws and procedures of the United States, particularly matters involving international terrorism.

3.   In the course of my duties, I have become familiar with the charges and evidence in the case of <u>United States v. Abid Naseer et al.</u>, Criminal No. 10-019 (RJD). The evidence at a

trial in this matter will establish that ABID NASEER was a member of one of three al-Qaeda terrorist cells preparing for attacks in Western countries. The evidence will prove that in late 2008 and 2009, al-Qaeda external operations leaders and facilitators located in the Waziristan region of Pakistan tasked NASEER, three American operatives, a Norwegian operative and others with ties to the West to return to their home countries and conduct terrorist attacks. The evidence will show that these Western operatives traveled to Pakistan during the same general time period – the second half of 2008 and early 2009 – met with al-Qaeda members, received training and returned home to begin preparing for the attacks. Al-Qaeda external operations leaders maintained operational contact with the three cells using two related U.S.-based email accounts which I shall refer to as EMAIL ACCOUNT A and EMAIL ACCOUNT B.

4.    With respect to the NASEER cell, between November 2008 and April 2009, NASEER, another Pakistani named Tariq Ur Rehman, and several associates prepared to conduct a terrorist attack in Manchester – likely in the vicinity of St. Anne's Square – in mid-April 2009. After returning from Pakistan, NASEER and the others purchased ingredients and components for explosives, conducted reconnaissance at potential target locations, transported reconnaissance photographs back and forth to Pakistan, and maintained frequent contact with al-Qaeda

leadership in Pakistan on EMAIL ACCOUNT A.  U.K. law enforcement disrupted the plot and arrested the subjects in April 2009.

5.    Also in 2009, related cells in the United States and Norway prepared to conduct similar terrorist attacks.  Both cells purchased the ingredients necessary to construct the explosive Triacetone Triperoxide, or TATP, the explosive used in the deadly London train bombings on July 7, 2005.  The American cell, which consisted of three al-Qaeda trained operatives, manufactured large quantities of TATP and prepared to carry out suicide bombings on New York City subways in September 2009.  Like NASEER, the American cell maintained operational email contact with al-Qaeda on EMAIL ACCOUNT A.  The Norwegian cell also purchased the ingredients and equipment necessary to manufacture TATP and maintained operational contact with al-Qaeda on EMAIL ACCOUNT B, which is listed as an alternate account of EMAIL ACCOUNT A.  The Norwegian cell appeared to be operating on roughly the same time schedule as the American cell, but delayed their efforts following the arrests in England and the United States.

6.    NASEER's actions, under the direction and control of al-Qaeda, subject him to liability under United States law for providing and conspiring to provide material support to al-Qaeda, in violation of 18 U.S.C. § 2339B(a)(1), as well as conspiring to use a destructive device in furtherance thereof, in violation of

18 U.S.C. §§ 924(c)(1)(B)(ii) and 924(o).

## SUMMARY OF THE FACTS OF THE CASE

A. Background of the Conspiracy and the
al-Qaeda External Operations Wing

    1. American Bryant Neal Vinas Joins al-Qaeda and
Meets External Operations Chief Saleh al-Somali,
also known as "Abdul Hafeez"

7. American al-Qaeda operative Bryant Neal Vinas has pleaded guilty to terrorism charges in the United States carrying sentences of up to life imprisonment. Vinas pleaded guilty pursuant to a cooperation agreement with the government that requires him to testify truthfully at any trial.

8. Vinas traveled to Pakistan in the summer of 2007 with the intention of waging violent jihad against United States armed forces in Afghanistan. Shortly after arriving in Pakistan, Vinas joined a fighting group based in the Mohmand Agency area of the Federally Administered Tribal Area of Pakistan ("FATA"), and conducted a cross-border military-style operation against United States and Afghan military personnel. Vinas eventually grew frustrated with the fighting group because they did not provide him with military-type training. Vinas left the group and traveled from safe house to safe house in the FATA looking to join a group that would provide him with training and enable him to fight American forces in Afghanistan. In approximately March 2008, Vinas met several al-Qaeda fighters who were staying at a particular safe house. One of these fighters ultimately helped

to facilitate Vinas's admission into al-Qaeda in Pakistan.

9. During the spring and summer of 2008, Vinas participated in a three-stage al Qaeda training program in the FATA, involving a basic weapons course, explosives training and projectile weapons training. All al-Qaeda members and recruits used aliases, or "kunyas," instead of their real names, to protect their identities and evade detection. Vinas met dozens of other al-Qaeda recruits, including one in particular who had family in Europe. As discussed below, a passport-sized photograph of this recruit was found in materials that the Norwegian cell leader brought back from Turkey in 2009.

10. During training, Vinas learned the operational structure of al-Qaeda. Al-Qaeda in Pakistan had two principal wings: one responsible for attacks in the Afghanistan/Pakistan region, and a second responsible for "external" attacks in the West. Vinas had significant contact with the leaders of both wings. The chief of external operations for al-Qaeda was originally from Somalia and used the alias "Abdul Hafeez" (sometimes pronounced "Hafidh") and was also called "Saleh" (hereinafter "Saleh" or "Saleh al-Somali"). Saleh al-Somali was responsible for recruiting, training and tasking operatives to conduct suicide bombings and other attacks against the United States, Europe and other Western countries. The external operations wing had advanced training courses in explosives,

electronics, counter-surveillance techniques and other subjects, although Vinas did not participate in these courses because he did not join that wing. Instead, after completing his basic training, Vinas received orders from the commander responsible for attacks in the Afghanistan/Pakistan region to join an al-Qaeda fighting group near the border of Pakistan and Afghanistan. While with this group, Vinas participated in a rocket attack against a U.S. military base.

11. In approximately November 2008, Vinas traveled to Peshawar where he was arrested by Pakistani authorities, expelled and transferred into United States custody for prosecution. Vinas was ultimately convicted of several terrorism-related charges, and is now available to testify.

> 2. Three More Americans Travel to Pakistan and Receive Training and Tasking from al-Qaeda External Operations Leadership

12. American al-Qaeda operatives Najibullah Zazi and Zarein Ahmedzay have pleaded guilty to terrorism charges in the United States carrying sentences of up to life imprisonment. Similar to Vinas, Zazi and Ahmedzay pleaded guilty pursuant to cooperation agreements with the government that require them to testify truthfully at any trial.

13. Zazi, Ahmedzay and Adis Medunjanin, friends from Queens, New York, traveled from New York to Peshawar, Pakistan on August 28, 2008. Although their goal was to travel to

Afghanistan and fight alongside the Taliban, Ahmedzay and Medunjanin were stopped by police on the way out of Peshawar and briefly detained. As a second resort, Zazi, Ahmedzay and Medunjanin sought help in seeking jihadist training at a local Peshawar mosque. The imam at the mosque introduced the men to "Ahmad," a Pakistani man who also used the name "Zahid." Ahmad offered to take the men to Waziristan for training with the "Arabs" or "muhajiroun." Zazi and Ahmedzay knew this to be a reference to al-Qaeda as opposed to a local group such as the Taliban. For the trip, all three chose "kunyas," or aliases, Zazi choosing "Salahuddin", Ahmedzay "Omar" and Medunjanin "Muhammad."

14. Ahmad took Zazi, Ahmedzay and Medunjanin to Miram Shah in North Waziristan – telling them that rather than staying to fight in Afghanistan, they would probably be sent back to the United States for another purpose. At a shop in Miram Shah, the men met a tall African who used the name "Abdul Hafeez," along with another man named "Ibrahim." As discussed, Abdul Hafeez was in fact Saleh al-Somali, then chief of external operations for al-Qaeda – that is, the man directly responsible for recruiting suicide bombers for attacks against the West. In addition, Ibrahim was an alias for Rashid Rauf, similarly responsible for al-Qaeda attacks against the West, including involvement in the 2006 transatlantic airplane bomb plot. After Saleh and Rauf met

the Americans, they left for several days (with Medunjanin's passport) while the Americans waited in Miram Shah. Saleh then returned with a driver, and took the Americans to an al-Qaeda weapons training compound in South Waziristan. This was a private external operations training program, and the al-Qaeda leaders kept the three Americans separated from other recruits. In fact, the three Americans did not meet or see any other recruits during their entire time with al-Qaeda.

15. While at the training compound, Zazi, Ahmedzay and Medunjanin were taught basic and heavy firearms use, and were shown various al-Qaeda propaganda videos on a laptop computer. Saleh al-Somali and another al-Qaeda leader named "Hamad" - who the government will prove was al-Qaeda leader Adnan El Shukrijumah - then encouraged them not to stay and fight on the front lines in Afghanistan, but rather to return to the United States and conduct a martyrdom attack instead. Although the al-Qaeda leaders and the three men discussed various potential targets in the United States, including Walmart, the New York Stock Exchange, and the New York City subway system, the leaders did not direct any one target, but instead emphasized their goals of maximizing the economic scale of the attack and the number of casualties. Zazi, Ahmedzay and Medunjanin agreed to return to the United States to conduct the attack.

16. After approximately two weeks, Zazi, Ahmedzay and

Medunjanin returned to Peshawar. Ahmedzay traveled to
Afghanistan to visit family, and Medunjanin, who had no family in
the region, returned to New York to avoid raising suspicions by
extending his trip. Approximately six weeks later, in
approximately early November 2008, Ahmad picked up Zazi in
Peshawar and brought him to Miram Shah. In Miram Shah, Saleh
again met Zazi, and brought him to an explosives training
compound (different from the first compound) in South Waziristan.
At this compound, Zazi had extensive discussions with Shukrijumah
about the U.S. operation. Zazi was taught how to make TATP as a
detonating explosive as well as several different main charge
explosives. TATP is made from hydrogen peroxide, acetone, and a
strong acid. One of the main charges could be made from flour
and peroxide; another from flour and ghee oil. Notably, all of
the improvised explosives could be manufactured with products
readily available at supermarkets, hardware stores, pharmacies or
beauty supply stores. Zazi was also taught to place the
completed explosives in a suicide vest, and to maximize
casualties by putting nails, ball bearings or metal nuts in the
vest as well. Zazi took notes during the training. During a
conversation that Zazi had with one of the al-Qaeda explosives
trainers, the trainer told Zazi that others from Europe had
recently received the same training.

17. At the end of the explosives training, Saleh al-Somali

told Zazi that Ahmad would be Zazi's contact after Zazi returned to the United States. Zazi told Saleh that he also wanted to contribute money and electronic equipment to al-Qaeda, and Saleh told Zazi to give the items to Ahmad as well.

18. After returning to Peshawar, Zazi went to an internet café, scanned his handwritten explosives training notes, and then emailed the files to himself. The government has recovered the notes, and can prove that the notes are in fact instructions for creating several types of improvised explosive devices, including TATP. Zazi then met with Ahmad in Peshawar, and Ahmad instructed Zazi to give Ahmad an email contact address. Zazi also gave Ahmad the cash and electronic equipment.

19. The al-Qaeda leaders told Zazi that Zazi should conduct the attack within one or two months after returning to the United States – that is, approximately February or March 2009.

20. As discussed below, after Zazi returned to the United States and was in the final stages of preparing to conduct suicide bombings with Ahmedzay and Medunjanin, Zazi communicated by email with Ahmad about the attack. Ahmad used EMAIL ACCOUNT A. The government will establish through lay and expert testimony that al-Qaeda's practice is to use specific operational accounts for communications between members, and that it would be highly unusual for al-Qaeda members to use the same account for both operational and personal use. The government will establish

that from its inception to the present, all communications to and from EMAIL ACCOUNT A were operational in nature.

B.   The Case Against Naseer

21.   The evidence at a trial in this matter will establish that ABID NASEER was a member of the United Kingdom-based branch of the multinational al-Qaeda conspiracy to attack Western countries.   In late 2008 and 2009, al-Qaeda external operations leaders and facilitators located in the Waziristan region of Pakistan conspired with NASEER that NASEER would return to the United Kingdom and conduct a terrorist attack there.   Al-Qaeda external operations leaders maintained operational contact with NASEER through the use of operational email accounts, specifically EMAIL ACCOUNT A and EMAIL ACCOUNT B.   During 2009, NASEER and his associates scouted potential targets, assembled the ingredients necessary to construct a TATP-based improvised explosive device, and selected a likely date range for the attack.   The attack would likely have been conducted in the vicinity of a shopping center in Manchester, United Kingdom. NASEER and his associates were arrested before the attack could be executed.

1.   Al-Qaeda Establishes Operational
       Contact with the U.K. Cell

22.   According to business records, EMAIL ACCOUNT A was created in Peshawar – Ahmad's home city – on November 30, 2008, the same approximate time that Zazi and Ahmad returned to

Peshawar from Waziristan (although they did not travel together). The account was registered to a female name in Pakistan, but the user of the account was Ahmad and possibly other al-Qaeda facilitators acting on behalf of Saleh al-Somali, Adnan El Shukrijumah and/or Rashid Rauf.

23. The same day EMAIL ACCOUNT A was created, the user sent an email to an address which I shall refer to as the NASEER EMAIL ACCOUNT because NASEER was the user of the account. The EMAIL ACCOUNT A user identified himself as "sohaib," and asked how NASEER was doing, whether he needed any help, and "how is going on ur study wish you all the best good luck." As discussed below, the reference to "study" is similar to al-Qaeda's communications with the Norwegian operative that his "test is very close."

24. According to business records, the NASEER EMAIL ACCOUNT was created on November 14, 2008, in Peshawar, Pakistan. Like EMAIL ACCOUNT A, the NASEER EMAIL ACCOUNT was registered in a female's name. However, ABID NASEER was the actual user of the account.

25. According to his passport entries and travel records, NASEER traveled from England to Pakistan on September 26, 2008, stayed in Pakistan for approximately two months, and returned to England on November 20, 2008. NASEER's associate Tariq Ur Rehman, also from Manchester, England, traveled to Peshawar on

November 16, 2008. NASEER and Rehman overlapped in Peshawar for four days. As mentioned, the NASEER EMAIL ACCOUNT was created in Peshawar on November 14, and was accessed three times before NASEER departed Pakistan on November 20.

26. On December 3, 2008, NASEER replied to al-Qaeda's November 30 email from a Cybernet Internet Café in Manchester:

> How is the weather over your side? How are your mates doing? I have heard that shahkirullah was not feeling well. I hope he is, his family and friends are ok. I went to see my mates in other city and came back last week. The weather over here is very cold. I saw a slight glimpse of Huma day before yesterday but she was very weak and difficult to convince. She says she is busy with her studies and it will take her long. Nadia is more gorgeous than huma at the moment and she is easy to befriend and since new year is coming so I guess she will suit me on that moment. Nadia is crystal clear girl and it wont take long to relate with her. Her parents like me as well. what do u suggest my friend? Thats all from my side. Pay my salam to aisha and chotu. Take care. (Emphasis added)

27. Given the evidence that EMAIL ACCOUNT A was an al-Qaeda operational account, the awkward language of the December 3 email is plainly coded. Indeed, as Zazi will testify, Ahmad and Zazi agreed upon a simple code using the word "wedding" or "marriage" to refer to a suicide bomb attack, and, as discussed below, Zazi and NASEER both used the term in communication with EMAIL ACCOUNT A. Moreover, NASEER had only one girlfriend, with whom he had broken up shortly before his final email to Ahmad noting his

"wedding" plans in April 2009. The government will establish that, viewed as code, NASEER's references to "Huma" and "Nadia" referred to different types of improvised explosives. As discussed above, Ahmad facilitated Zazi's entry into an al-Qaeda explosives training compound where Zazi learned several types of improvised explosives, including one that crystallized during preparation, which explains NASEER's "crystal clear" reference.

28. The EMAIL ACCOUNT A user replied on December 14, again asking about NASEER's "study" and whether he needed any help. NASEER replied the next day from the NASEER EMAIL ACCOUNT:

> About my Girl Friend. As I told you about huma's affair. She is nice and I still love her. <u>Somebody told me she works in my friend's shop I am going to join so lets see If she is still there</u>. I will ask the staff and other fellows if she was or is around then we will see what happens. Nadia is still waiting for my response. She is very loyal and She has created a place in my heart. <u>You know Gulnaz and fozia.</u> WOW man. I would love to get them in my friends list but you know I have been thinking about their abilities. <u>Gulnaz sounds ok but she is found of money and in order to approch her I must find work to save money. Fozia is some times bull shit.</u> She lets you down sometime. I havent got her contact number. I will try to figure out her contact and then I will talk to her.
>
> I am still keeping my car because most of the jobs they ask for it and other reason is <u>you know girls mostly like guys with car</u>. They love money and nice car. Thats they all about. (Emphasis added)

29. The government will establish that NASEER's references

14

to women's names refer to the different possible improvised explosives. In particular, the reference to "fozia" as "bull shit" suggests it may be a fertilizer-based explosive. The reference that "Huma works in my friend's shop I am going to join so lets see If she is still there" suggests NASEER has found a location to obtain the explosive ingredient. The reference to a car suggests NASEER contemplated a car bomb attack.

30. On January 1, 2009, NASEER opened a second email account at the Cybernet Café in Manchester. This account was similarly registered using a female name, and listed Algeria as the country of origin. Using this second account, NASEER sent a short email to EMAIL ACCOUNT A on January 4. EMAIL ACCOUNT A replied to the original NASEER EMAIL ACCOUNT (rather than the new account) on January 15:

> ...And how is going on ur study and ur life. chotooo is also fine and be happy. hmmmm so u have alot of girl friendsss me also like girlsssss pay my salam for ur girls friend ok when ever u will mariii soo plz first seee ur girl friend how is she... is she nice and beautiy and honest. bec we marii in life on one time there for we can seee and be carefull and be relaxx then u mariii okkkkkkk and see a new car and take buy it and any kind of help from my sife plz  telll me
> (Emphasis added)

31. The government will establish that al-Qaeda was asking NASEER when the "marriage" - i.e., terrorist attack - would take place; encouraging the use of a car; and if NASEER needed "any kind of help" from "my si[d]e" - i.e., Pakistan. As noted above,

Ahmad used the code word "wedding" or "marriage" with Zazi to refer to a finalized suicide bomb attack.

### 2. Al-Qaeda Creates Account to Establish Operational Contact with the Norwegian Cell

32. On January 1, 2009, the same day al-Qaeda sent this email to NASEER from EMAIL ACCOUNT A, al-Qaeda created EMAIL ACCOUNT B in Peshawar as an alternate account of EMAIL ACCOUNT A. The service provider sent a confirmation email to EMAIL ACCOUNT A verifying the creation of EMAIL ACCOUNT B, and IP address and email header information reflect that just minutes before EMAIL ACCOUNT B was created, EMAIL ACCOUNT A was accessed from the same IP address in Pakistan.

33. As discussed below, the evidence will establish that al-Qaeda used EMAIL ACCOUNT B to communicate with Mikeal Davud, an ethnic Uigher Norwegian. Davud traveled to Turkey in October 2008 and returned to Norway in April 2009, almost certainly traveling to Pakistan in between. Davud then traveled to Turkey again, and returned to Norway in July 2009. After returning to Norway, Davud and two other cell members assembled ingredients to manufacture explosives. Davud also brought back to Norway passport photographs of two jihadist-linked individuals with ties to Europe: one individual was an al-Qaeda operative who had trained with American Bryant Neal Vinas in 2008; the other individual, named Ibrahim Adam, was the brother of two participants in a plot to explode fertilizer-based bombs in

London, and absconded from supervision while under a United Kingdom control order in 2007.  Davud's address book also contained an entry for EMAIL ACCOUNT B, and listed the name "Abdul Hafeez," in Arabic, next to the entry.  As discussed, Abdul Hafeez was the name used by al-Qaeda external operations chief Saleh al-Somali.

### 3.  NASEER Prepares for Terrorist Attack In England

34.  On January 26, 2009, from his second email account, and again on February 16, 2009, from the NASEER EMAIL ACCOUNT, NASEER sent two identical emails to EMAIL ACCOUNT A, as follows:

> I have found a security job now and there is good money in it.  I was in need of money because of the family problems and above all the marriage ceremony.  You know what girls are like.  They demands loads of stuff Jewellery, Dresses, beauty things and many more.  The girls born over here are very modern so you have to take care of their demands every time.  I am satisfied with my company of females LOL.  They are simple and easily managable.  All you have to do is to be serious and give them plenty of time.  I am constantly in touch with the famalies of the girls I mentioned before and will choose which ever can be my faithful and loving wife. I am bore of being a bachelor now LOL so I would try to make it happen in the near future.  I will be careful about my choice beacause your whole family life depends upon the decision. I will look at every aspect of their family and relatives and I am sure when the engagement is finalised then it will be huge party for everyone. I am trying to include as many as possible in ceremony when it take place and hopefully it will happen. As you mentioned about the car, well yes I am saving some money to buy a nice and reliable vechile which will be enough for my bide and

my childrens in future LOl. (Emphasis added).

35. As in the previous emails, the references to a "marriage ceremony . . . happen[ing] in the near future," "when the engagement is finalized then it will be a huge party for everyone," and "includ[ing] as many as possible in ceremony when it take place," are code that NASEER was getting closer to the attack date and had picked a location that would maximize casualties. NASEER was not in fact planning a wedding at the time. Along the same lines, the reference to the "females" being "simple and easily manageable . . . all I have to is to be serious and give them plenty of time" indicates that NASEER had successfully experimented with manufacturing the required explosives.

36. On March 24, 2009, NASEER traveled to the Birmingham airport and picked up Rehman, who was returning from Pakistan. (As discussed above, NASEER overlapped with Rehman in Peshawar just before NASEER returned to England on November 20, 2008.) Rehman had in his possession a USB device containing photographs of locations in Manchester that, as indicated by their framing and content, were reconnaissance photographs rather than tourist mementos. NASEER and Rehman then spent the next several days together. On March 24, surveillance officers followed Rehman to the Cybernet Internet Café, where Rehman was observed at a computer with a disc. Two days later, NASEER accessed both the

NASEER EMAIL ACCOUNT and his second email account from the same internet café.

37. On April 3, 2009, NASEER sent his final email to the EMAIL ACCOUNT A user, stating that the "nikah" [wedding] - i.e., attack - would be conducted between April 15 and 20, and indicating that NASEER had chosen which "girlfriend" to wed -- i.e., which explosive to use:

> I am doing well as usual and having good time. The weather is getting warmer here and we have loads of things to enjoy. You know how is it over here when its summer. People out to the beaches and going on holidays. Well we had some short trips to riverside as well. My mates are fine and yes my affair with Nadia is soon turning in to family life. I met with Nadia family and we both parties agreed to conduct the nikah after 15th and before 20th of this month. I have confirmed the dates from them and they said you should be ready between these dates. I am delighted that they have strong family values and we will have many guests attending the party. I am sure Nadia was the right choice for me at this time because I was getting older day by day LOL. Anyways I wished you could be here as well to enjoy the party. Thats all from here, nothing new to write down. (Emphasis added)

38. As noted above, NASEER had only one girlfriend at the relevant time - not named Huma, Nadia, Gulnaz, or Fozia - and rather than making plans for a wedding in mid-April 2009, they had recently broken up at the time. After sending this email, NASEER deleted the entire contents of the NASEER EMAIL ACCOUNT.

39. The next day, April 4, 2009, Rehman took reconnaissance

photographs in the vicinity of St. Anne's Square in Manchester. Rehman then met with NASEER. NASEER then stopped at the Cybernet café, and traveled to Liverpool later that afternoon. NASEER spent the next three days, April 5 through 7, 2009, in Liverpool.

40. On April 8, 2009, British law enforcement officers arrested NASEER, Rehman, and their associates. Pursuant to a court-authorized search of NASEER's and his associates' residences, law enforcement officers found, among other items, three large bags of flour and an industrial sized container of oil. As discussed above, Zazi had been trained by al-Qaeda explosives trainers to use flour and oil as components of one of the "main charge" improvised explosives. A search of Rehman's residence revealed hundreds of reconnaissance photographs of Manchester sites, including photographs of several of the main entrances and exits at the Arndale Center, the largest shopping mall in Manchester, in the vicinity of St. Anne's Square. As with the photographs from the USB drive, the number, contents, and framing of the photographs indicate that they are not tourist photos.

C.  American Cell Prepares for U.S. Attacks

41. As discussed above, al-Qaeda leadership had instructed the American cell to carry out their suicide bombings at the beginning of 2009 — the same approximate time period NASEER and the U.K. cell were preparing to conduct their attack. However,

after returning to the United States, Zazi, Ahmedzay and Medunjanin decided to delay their plans, in part out of concern that law enforcement would be watching them after having traveled to Pakistan. So they waited several months, and then in approximately the summer of 2009, Zazi, Ahmedzay and Medunjanin met to plan the attack. Over the summer, Zazi gathered the necessary materials to construct the TATP detonator, including hydrogen peroxide, acetone, and hydrochloric acid, and manufactured enough TATP for approximately 15 detonators. In late August 2009, Zazi realized that although he could create the TATP, he could only remember the instructions for the flour-and-peroxide main charge, and not the flour-and-ghee main charge. He therefore decided to contact the al-Qaeda facilitator Ahmad in Pakistan, and directed a cousin in Peshawar to find Ahmad near the mosque.

42. Shortly thereafter, on September 6, 2009, Zazi received an email from EMAIL ACCOUNT A – the same account al-Qaeda used to communicate with NASEER – with the subject line "zahid here," asking "how r u . . . i need Muhammad email address or phone number . . . how is ur business and family." As noted above, Medunjanin had used the kunya "Muhammad" while in Pakistan, and Ahmad had used the name "Zahid."

43. Zazi responded the same day: "how r u and to good to hear from u . . . zahid listen i need a amount of the one mixing

of [Flavor and gee oil} and i donot khow the amout plz right away." Having received no response, Zazi added, 12 minutes later, "plez reply to what i asked u right away. the marriage is ready flour and oil." The next morning, Zazi sent another email in large type, reading "plz sends me details about about {gee and flour} {mixtures} Right away plz." As discussed, "marriage" was the code that Zazi and Ahmad agreed to use to refer to the suicide bombing attack, and the same code NASEER used in his communications with EMAIL ACCOUNT A.

44. When Zazi did not receive another response from al-Qaeda, he drove to New York to meet with Ahmedzay and Medunjanin and conduct the attack, bringing with him the TATP, connection wires, hydrochloric acid and other materials. Their plan was to conduct coordinated suicide bombings on New York City subway lines the following week, and to use the flour-peroxide main charge instead of the flour-oil combination (if Zazi did not hear back from Ahmad about the flour-oil instructions). Ultimately, however, the men determined that they were under police surveillance and aborted the attack. Zazi and Ahmedzay were ultimately arrested, charged, and convicted of a terrorist plot to explode improvised explosive devices in the United States, and are now available to testify against NASEER and the other conspirators. Medunjanin was also charged, and is awaiting trial.

D.   Norwegian Cell Prepares for Attacks

45.   During the same time period that the American cell was manufacturing TATP and preparing for the New York subway attack, the Norway cell was communicating with the al-Qaeda EMAIL ACCOUNT B, assembling ingredients for TATP and transporting passport photographs of another al-Qaeda operative and jihadist-linked individual.

46.   Mikeal Davud, who used the alias "Ahmet" or "Ahmad," flew from Norway to Turkey in October 2008 and returned to Norway in April 2009.  Davud then traveled to Turkey again and returned to Norway in July 2009.  Former al-Qaeda operative Bryant Neal Vinas will testify that al-Qaeda recruits from Europe – particularly those who had no prior connection to Pakistan or Afghanistan – often traveled covertly into Pakistan by starting in Turkey, crossing illegally into Iran and getting smuggled across the border into Pakistan by al-Qaeda facilitators.

47.   On April 13, 2009, five days after NASEER was arrested in England, an individual in Turkey sent an email to al-Qaeda at EMAIL ACCOUNT B:

> Brother Ahmet came over.  We are with him. Because of some problems, I changed the email address.  Let's communicate from this address from now on, God willing.  Ahmet came.  He says hi.  He just came here a little late. He was late because he was busy with repairing mp4.  In the meantime, because of this delay, his computer test is very close. Because he doesn't have time to buy a new computer, you must send your own computer.

Also, send a <u>4GB flash disc</u> along with the computer. Convey to Ismail. (Emphasis added).[1]

48. On April 26, Davud sent an email to EMAIL ACCOUNT B, referring to himself as "Ahmad" and stating, "I need brother Ismail's computer because my computer is broken. I have sent it to the company to have them fix it for me for a period of time. Until then I need to borrow a computer from brother Ismail." On May 7, another email account in Turkey sent a follow-up email to EMAIL ACCOUNT B: "We had asked a computer for Ahmet? You didn't write any reply??? Ahmet came back again. He says that your computer is urgently needed, and the test is drawing closer . . . It will be forwarded to Ismail." On June 13, Davud sent another email (from Turkey) to EMAIL ACCOUNT B, stating, "I am waiting for the computer. Let me have an answer."

49. Given the available evidence that EMAIL ACCOUNT B is an al-Qaeda operational account and that Davud was neither in the computer business nor a school student, the otherwise incoherent references to "computer," the "test drawing closer" "mp4" and "4GB flash disc" are, like the emails sent by NASEER, plainly coded. The coded communications suggest that Davud ("Ahmet" or "Ahmad") had returned to Turkey in April, presumably from Pakistan. The reference to Davud's "test drawing closer" is similar to al-Qaeda asking NASEER about his "study," and the

---

[1] The emails discussed in this section are draft English translations.

reference to changing email addresses "because of some problems" less than a week after the arrests of the U.K. cell suggests that al-Qaeda was concerned that its personnel had been compromised.

50.    As stated above, Davud returned to Norway in July 2009 and Norwegian law enforcement officials commenced court-authorized surveillance.  The officers observed that Davud had frequent covert meetings and coded conversations with Shawan Sadek Bujak, a legal resident of Norway who was born in Takrit, Iraq, and David Jakobsen, also known as "Aliser Abdulaif," a legal resident of Norway who was born in Uzbekistan.  Notably, Davud met separately with Bujak and Jakobsen, and officers observed that Davud took steps to avoid meeting with Bujak and Jakobsen together.

51.    In late August and early September – the same time period the American cell was finalizing its attack preparation – the Norwegian cell assembled components necessary to prepare TATP.  Surveillance revealed that on or about August 26, 2009, Davud and Bujak drove together in Bujak's car to a hardware store in Oslo.  Based on credit card records, Davud and Bujak purchased several items that could be used to measure, mix and prepare improvised explosives such as TATP, including three plastic funnels, protective goggles, a package of dust masks, an electronic weight scale, a thermometer and a mixing spoon.  (When preparing TATP for the American cell, Zazi similarly purchased

protective goggles and a digital scale.)  Two days later, Davud
and Jakobsen drove in Jakobsen's car to a pharmacy in Oslo.
Jakobsen asked a pharmacy employee about hydrogen peroxide, but
did not buy it because the employee told him that the pharmacy's
hydrogen peroxide contained only a six-percent concentration.

    52.  On or about September 1, 2009, Norwegian law
enforcement officers conducted a court-authorized covert search
of Davud's apartment.  The officers found, among other items, two
bottles of 10% concentrated hydrogen peroxide.  The bottles were
wrapped in plastic.  On or about September 3, Jakobsen visited
another pharmacy in Oslo and asked whether the store carried
hydrogen peroxide at a 30% concentration.  The pharmacy employee
said that the pharmacy could order the product.  Jakobsen
provided his phone number to the employee, but gave a false name.
The next day, Jakobsen drove to the pharmacy and purchased a one-
liter bottle of hydrogen peroxide with a 30% concentration.
Jakobsen then drove home and called Davud.  Pursuant to court-
authorized surveillance of Jakobsen's telephone, officers learned
that Jakobsen told Davud that he did not want to keep "the
medicine" at his residence because children were present.
Jakobsen then drove to Davud's apartment, met Davud outside and
walked into the apartment together with Jakobsen carrying the
one-liter bottle of hydrogen peroxide.

    53.  The next day, September 5, 2009, pursuant to the court-

authorized surveillance of Jakobsen's telephone, Jakobsen was intercepted calling Davud and engaging in a coded conversation. According to a draft summary translation, Jakobsen asked whether Davud "drank the medicine" and whether it worked. Davud replied that "it was the right medicine" and said that he also gave some of the "medicine" to "the brother," who also may have "drank" it.

54. On September 6, 2009, Davud traveled back to Turkey. Travel and credit card records, surveillance and other evidence reflect that on September 5, 2009, Bujak drove Davud to a bus station in Oslo, and Davud took a bus to Sweden. The next day, Davud took a flight to Istanbul, Turkey. Bujak purchased Davud's airline ticket, and Jakobsen purchased his bus ticket.

55. On or about September 7, 2009, Norwegian law enforcement officers conducted a court-authorized, covert search of Davud's apartment. Officers found, among other items, the one liter bottle of 30% hydrogen peroxide that Jakobsen had purchased. Notably, however, the two bottles of 10% hydrogen peroxide were missing. Officers also found the weight scale and plastic funnels that Davud and Bujak had purchased at the hardware store. In addition, officers found citric acid and several paper coffee filters, but no coffee maker. An explosives expert will testify that citric acid is a common acid used in improvised explosive devices, and filtering devices such as coffee filters may be necessary during the production of TATP and

similar explosives. (For example, Zazi used coffee filters to produce TATP in furtherance of the American branch of the plot.)

56. Travel records reflect that on or about October 4, 2009, Davud took a return flight from Istanbul, Turkey to Sweden. Davud then traveled to the Norwegian border, where law enforcement officers observed Bujak pick up Davud in Bujak's car. The two drove a short distance, pulled over, walked over to a park bench near the road, had a private conversation for approximately 30 minutes before driving the rest of the way to Oslo.

57. Norwegian court-authorized interceptions reflect that on or about October 7, 2009, Davud and Bujak met in Davud's apartment. They talked in code and often in hushed tones, suggesting they were concerned that their conversation was being monitored. During the conversation, Davud and Bujak discussed that it was better to use "bachelors" than "married men."

58. On or about October 23, 2009, Norwegian law enforcement officers conducted another court-authorized, covert search of Davud's apartment. The officers found an address book in Davud's apartment. In the address book were two entries for the al-Qaeda EMAIL ACCOUNT B: one was written in the book itself, and a second was written on a slip of paper contained inside the book. Both entries listed the name "Abdul Hafeez" next to the email address. As discussed above, multiple cooperating witnesses will testify

that Abdul Hafeez was the alias used by Saleh al-Somali, the chief of external operations for al-Qaeda. The officers also found a passport-sized photograph of an individual with European ties who trained with Vinas at an al-Qaeda training camp during the spring and summer of 2008.

59. On November 21, 2009, Davud and Bujak went to an auto parts store to ask for battery acid. (The government will establish that battery acid can also be used to manufacture TATP.) At approximately the same time, Davud (who did not have a driver's license) was also shopping for a used car on the internet.

60. On January 20, 2010, Norwegian law enforcement conducted a court-authorized search of a storage locker used by Bujak in an adjoining building. The officers found, among other things, safety goggles and bottles of acetone and hydrogen peroxide. As discussed, hydrogen peroxide and acetone are two of the three critical ingredients of the explosive TATP.

61. Davud and Jakobsen were arrested in Norway on terrorism charges on July 8, 2010; Bujak was arrested simultaneously in Germany, and has been transferred to Norway to face the same charges.

## PROCEDURAL HISTORY OF THE CASE

### A.   The Charging Process

62.   Under the federal law of the United States, a criminal prosecution is commenced when a grand jury files an indictment. Institutionally, a grand jury, though an arm of the court, is an independent body composed of private citizens - not less than 16 and not more than 23 people - whom the United States District Court selects at random from the residents of the judicial district in which the court resides.  The purpose of the grand jury is to review the evidence of crimes presented to it by United States law enforcement authorities.  After independently reviewing this evidence, each member of the grand jury must determine whether there is probable cause to believe that a crime has been committed and that a particular person committed that crime.  If at least 12 jurors find that the evidence they have reviewed provides probable cause to believe that a particular person committed the crime, the grand jury may return an indictment.  An indictment is a formal written accusation that charges the particular person, now a defendant, with a crime, identifies the specific laws that the defendant is accused of violating, and specifies the date and place where the charged crime occurred.

63.   The grand jury initiates the criminal prosecution when it files the indictment with the United States District Court.

Thereafter, a United States Magistrate Judge issues a warrant for the defendant's arrest.

64. If additional evidence is presented to a grand jury as to a defendant against whom an indictment has already been returned, the grand jury may return a superseding indictment using the same procedure as is used with an original indictment. In such instance, the superseding indictment may take the place of the previous indictment. If still more evidence is presented to a grand jury after a superseding indictment has been returned, the grand jury may return a second superseding indictment that takes the place of the earlier superseding indictment. A warrant for the defendant's arrest may issue, but need not issue, from a superseding indictment, or second superseding indictment, by using the same procedure as is used to issue an arrest warrant on an original indictment.

65. On January 9, 2010, a grand jury sitting in the Eastern District of New York returned an indictment charging Adis Medunjanin with crimes related to his role in the plot. On February 24, 2010, the grand jury returned a superseding indictment charging Medunjanin and Zarein Ahmedzay with additional crimes related to their roles in the plot. On June 30, 2010, the grand jury returned a second superseding indictment charging Abed NASEER and co-conspirators Tariq Ur Rehman, "Ahmad," whose real name is unknown, Medunjanin, and a fifth

individual, whose identity is sealed, with crimes related to their roles in the plot.

66. On July 7, 2010, a grand jury sitting in the Eastern District of New York returned a third superseding indictment charging NASEER, the same four co-conspirators as listed above, and a sixth individual, Adnan El Shukrijumah, with criminal offenses against the laws of the United States, and filed this indictment with the United States District Court for the Eastern District of New York. The charges against NASEER in the third superseding indictment are materially identical to the charges against NASEER in the second superseding indictment. It is the practice of the United States District Court for the Eastern District of New York to retain the original superseding indictment and file it with the records of the court. Therefore, I have obtained a copy of the superseding indictment, certified as true and accurate, from the clerk of the court, and have attached it to this affidavit as Exhibit A.

67. On July 7, 2010, based on the superseding indictment filed by the grand jury, United States Magistrate Judge Ramon E. Reyes signed a warrant for NASEER's arrest. It is the practice of the United States District Court for the Eastern District of New York to retain the original arrest warrant and file it with the records of the court. Therefore, I have obtained a copy of the arrest warrant, certified as true and accurate, from the

clerk of the court and have attached it to this affidavit as
Exhibit B.

B.   The Charges and Pertinent United States Law

68.   The superseding indictment charges in three counts that
NASEER and co-conspirators committed the following offenses:

Count 3:        providing material support to a foreign terrorist
                organization, specifically al-Qaeda, in violation
                of 18 U.S.C. § 2339B(a)(1), punishable by a
                maximum penalty of 15 years' imprisonment;

Count 4:        conspiracy to provide material support to a
                foreign terrorist organization, specifically al-
                Qaeda, in violation of 18 U.S.C. § 2339B(a)(1),
                punishable by a maximum penalty of 15 years'
                imprisonment; and

Count 10:       conspiracy to use a destructive device during and
                in relation to one or more crimes of violence,
                specifically providing and conspiring to provide
                material support to a foreign terrorist
                organization, in violation of 18 U.S.C. §§
                924(c)(1)(B)(ii) and 924(o), punishable a maximum
                penalty of life imprisonment.

69.   The United States requests the extradition of NASEER
for the offenses enumerated in counts 3, 4 and 10 but not for the
offenses enumerated in counts 1, 2 and 5 through 9, which do not
name NASEER as a defendant.   Each count (3, 4 and 10) charges a
separate offense.   Each offense is punishable under a statute
that (1) was the duly enacted law of the United States at the
time the offense was committed, (2) was the duly enacted law of
the United States at the time the superseding indictment was
filed, and (3) is currently in effect.   Each offense is a felony
offense punishable under United States law by more than one year

of imprisonment. I have attached copies of the pertinent sections of these statutes and the applicable penalty provisions to this affidavit as Exhibit C.

i. Count 3

70. Count 3 charges NASEER, Adis Medunjanin, Adnan El Shukrijumah, Tariq Ur Rehman, "Ahmad," and a sixth individual with providing material support to a foreign terrorist organization, specifically al-Qaeda, in violation of 18 U.S.C. § 2339B(a)(1).

71. To establish the crime of providing material support to a foreign terrorist organization, the government must prove that NASEER knowingly provided material support or resources to a designated foreign terrorist organization. The term "material support or resources" includes any property, tangible or intangible, or service, including currency, expert advice or assistance, communications equipment, and personnel, except medicine or religious materials. The government must also prove that NASEER had knowledge that the organization was a designated terrorist organization or that the organization engaged in terrorist activity or terrorism.

72. The evidence at trial will establish that NASEER specifically provided "personnel" - himself and others, including Rehman - to act under the "direction and control" of al-Qaeda. On October 8, 1999, the U.S. Secretary of State designated al

Qaeda as a foreign terrorist organization in accordance with section 219 of the Immigration and Nationality Act. Through the testimony of cooperating witnesses Najibullah Zazi, Zarein Ahmedzay and Bryant Neal Vinas, the government will establish that al-Qaeda had an external operations wing based in Waziristan that recruited and trained operatives and developed plans for attacks in Western countries. Saleh al-Somali, also known as "Abdul Hafeez," was the head of external operations, Adnan El Shurkrijumah and Rashid Rauf were also senior leaders, and Ahmad, who lived in Peshawar, acted as a facilitator and courier for Saleh, transporting recruits between Peshawar and Waziristan, transferring money and communications equipment to Saleh, and sending and receiving email communications on behalf of Saleh. The government will establish through emails, cooperator testimony and physical evidence that EMAIL ACCOUNT A and EMAIL ACCOUNT B accounts were used by al-Qaeda external operations leadership and facilitators, including Saleh al-Somali and Ahmad, to communicate with Western external operatives about planned attacks in the United States, England and Norway during 2009, and that communications in the emails about weddings, marriage, girlfriends, computers and the weather were codes that referred to attacks, bomb ingredients, travel documents and target sites.

73. In addition, emails, surveillance and other documentary and physical evidence will show that between December 2008 and

April 2009, NASEER, Rehman, and their associates prepared to conduct a terrorist attack in Manchester, England – likely in the vicinity of St. Anne's Square – in the middle of April 2009. NASEER received training and tasking from al-Qaeda in Pakistan, and NASEER and the others purchased ingredients and components for explosives, conducted reconnaissance at several possible target locations, transported reconnaissance photographs back and forth to Pakistan, and, as discussed, maintained frequent email contact with al-Qaeda during the entire time period.

74.  In addition, pursuant to 18 U.S.C. § 2, anyone who aids or abets, or willfully causes the commission of an offense is punishable as a principal.

75.  Finally, the government will establish that NASEER knew that al-Qaeda engaged in terrorist activity at a minimum because he agreed to engage in an explosive attack on al-Qaeda's behalf.

ii.  Count 4

76.  Count 4 charges NASEER, Adis Medunjanin, Adnan El Shukrijumah, Tariq Ur Rehman, "Ahmad," and a fifth individual with conspiracy to provide material support to a foreign terrorist organization, specifically al-Qaeda, in violation of 18 U.S.C. § 2339B(a)(1).

77.  Under U.S. law, a conspiracy is an agreement to commit one or more criminal offenses.  The agreement on which the conspiracy is based need not be expressed in writing or in words,

but may be simply a tacit understanding by two or more persons to do something illegal. Conspirators enter into a partnership for a criminal purpose in which each member or participant becomes a partner or agent of every other member. A person may become a member of a conspiracy without full knowledge of all of the details of the unlawful scheme or the identities of all the other members of the conspiracy. If a person has an understanding of the unlawful nature of a plan and knowingly and willfully agrees to it, joining in the plan, he is guilty of conspiracy even though he did not participate before and may play only a minor part.

78. A conspirator can be held criminally responsible for all reasonably foreseeable actions undertaken by other conspirators in furtherance of the criminal partnership. Moreover, because of this partnership, statements made by a conspirator in the course of and while he is a member of the criminal conspiracy are admissible in evidence not only against that conspirator, but also against all other members of the conspiracy. This is so because, as stated earlier, a conspirator acts as an agent or representative of the other conspirators when he is acting in furtherance of their illegal scheme. Therefore, statements of conspirators made in furtherance of the conspiracy may be deemed to be the statements of all conspirators.

79. The crime of conspiracy is an independent offense,

separate and distinct from the commission of any specific "substantive crimes." Consequently, a conspirator can be found guilty of the crime of conspiracy to commit an offense even where the substantive crime that was the purpose of the conspiracy is not committed. The U.S. Congress has deemed it appropriate to make conspiracy, standing alone, a separate crime, even if the conspiracy is not successful, because collective criminal planning poses a greater threat to the public safety and welfare than individual conduct and increases the likelihood of success of a particular criminal venture.

80. There is a specific type of conspiracy recognized under United States case law referred to as a "hub and spoke" or "wheel" conspiracy. In essence, a "hub and spoke" conspiracy exists where the leadership of a conspiracy – the "hub" – tasks operatives or members – the "spokes" – to carry out the criminal goals of the conspiracy. A single conspiracy exists under the applicable United States law where the "spokes" knew or had reason to know of the existence, but not necessarily the identity, of one or more of the other "spoke" participants in the conspiracy.

81. To satisfy its burden of proof and convict NASEER on Count 4, the government, at trial, must establish beyond a reasonable doubt each of the following essential elements: (1) that two or more persons entered an agreement to commit the

underlying offense, (i.e., to provide material support to al-
Qaeda); and (2) that NASEER knowingly became a member of the
conspiracy to commit the underlying offense.

82.  The evidence will establish that the al-Qaeda external
operations leadership "hub" in Pakistan, consisting of Saleh al-
Somali, Adnan El Shukrijumah, Rashid Rauf, and Ahmad, conspired
with "spokes" in England (NASEER, Tariq Ur Rehman and others),
the United States (Najibullah Zazi, Zarein Ahmedzay and Adis
Medunjanin) and Norway (Mikeal Davud, Shawan Sadek Bujak, and
David Jakobsen) to provide material support to al-Qaeda.  The
evidence will show that NASEER "knew or had reason to know" that
additional operatives were plotting similar attacks against
Western countries.  This is plain from the very nature and
history of al-Qaeda, an organization that exists for the purpose
of launching attacks against the United States, Europe and other
perceived "enemies" of Islam.  U.S. cooperating witnesses will
testify that al-Qaeda training includes propaganda videos and
sermons about prior successful attacks and al-Qaeda's ambitious
plans to destroy the West.  They will testify that it is clear to
all recruits (and anyone with rudimentary knowledge of al-Qaeda)
that al-Qaeda sends operatives all over the world for attacks.
As discussed above, Zazi will testify that he was specifically
told that Europeans had recently received the same explosives
training that he had received.  In addition, as discussed above,

Norwegian operative Davud was in possession of a passport photograph of another al-Qaeda Western operative who trained with Bryant Neal Vinas. This evidence proves that while al-Qaeda leadership compartmentalized information and took steps to prevent operatives from knowing details about each other, al-Qaeda recruits understood that they were part of a larger organization of jihadists fighting against the West. Accordingly, the only logical inference is that NASEER, himself an al-Qaeda operative, had reason to know that he was not the only one in the world plotting attacks on behalf of al-Qaeda external operations leadership.

### iii. Count 10

83. Count 10 charges NASEER, Tariq Ur Rehman and Ahmad, together with others, with conspiracy to use a destructive device during and in relation to one or more crimes of violence, specifically providing and conspiracy to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. §§ 924(c)(1)(B)(ii) and 924(o).

84. To establish the crime of conspiracy to use a destructive device in furtherance of a crime of violence, the government must prove that NASEER agreed with at least one other person to use or carry a destructive device, or posses a destructive device, in furtherance of any crime of violence. Pursuant to Section 921(a)(4), "destructive device" includes any

explosive bomb or grenade. Moreover, under applicable United States law, providing and conspiring to provide material support to a foreign terrorist organization constitutes a "crime of violence."

85. As explained in detail above, the evidence establishes that NASEER, Rehman and Ahmad, together with others, conspired to use explosive bombs in England, and did so in furtherance of a conspiracy to provide material support to al-Qaeda, which constitutes a "crime of violence" predicate.

C.   The Arrest of NASEER

86. On July 7, 2010, officers of the Manchester Metropolitan Police arrested NASEER pursuant to a request for his provisional arrest submitted by the United States. At the time of his arrest, NASEER was using his true name. NASEER is being held by United Kingdom authorities. I have attached a photograph of NASEER as Exhibit D. This photograph was provided to the government by the U.K. authorities, specifically New Scotland Yard Counterterrorism Command. The photograph is of the Abid Naseer who was the subject of the U.K. investigation and the April 2009 U.K. arrest described above, and thus the Abid Naseer who committed the crimes charged in the superseding indictment.

87. I have attached the following documents in support of this request for the extradition of NASEER:

Exhibit A. certified copy of the superseding indictment, dated July 7, 2010

Exhibit B.     certified copy of the arrest warrant, dated
               July 7, 2010

Exhibit C.     pertinent sections of the following statutes
               and their penalties:

                    18 U.S.C. § 2339B(a)(1)
                    18 U.S.C. §§ 924(c) and (o)
                    18 U.S.C. § 2

Exhibit D.     photograph of NASEER

     I have thoroughly reviewed the government's evidence

against NASEER and attest that this evidence indicates that

NASEER is guilty of the offenses charged in the superseding

indictment.

     Executed this 1st day of September, 2010, at Brooklyn,

New York, United States of America.


                         LORETTA E. LYNCH
                         United States Attorney
                         Eastern District of New York


                         Jeffrey A. Knox
                         Assistant United States Attorney
                         Chief, Violent Crimes & Terrorism


     Signed and sworn to before me this 1st day of September,

2010, at Brooklyn, New York.


                         HONORABLE ROSLYNN R. MAUSKOPF
                         United States District Judge
                         Eastern District of New York